116 Cal.Rptr.2d 858 (2002)
96 Cal.App.4th 386
ESTATE OF Arthur Patrick FORD, Deceased.
Terrold Bean, Petitioner and Appellant,
v.
John J. Ford III et al., Objectors and Respondents.
No. A094755.
Court of Appeal, First District, Division Two.
February 21, 2002.
As Modified on Denial of Rehearing March 12, 2002.
Review Granted June 12, 2002.
*859 Patrick Sullivan (No. 67339), Oakland, CA, Attorney for Appellant.
Thomas J. Williams (No. 29085), San Francisco, CA, Attorney for Respondent.
HAERLE, J.

I. INTRODUCTION
This is an appeal from an order of the probate court denying the claim of appellant Terrold Bean (hereafter Bean) to be the equitably adopted son of decedent Arthur Patrick Ford (hereafter Ford) and *860 hence inherit Ford's intestate estate. We affirm.

II. FACTUAL AND PROCEDURAL BACKGROUND
In September 1955, Bean, then a little over one year old, was placed in the foster care of Ford and his wife. At the time, the Fords acted as foster parents for many children placed in their care by, mainly, the San Francisco Superior Court. The Fords were paid a monthly stipend by the City and County of San Francisco for their foster care. Bean was one of approximately 10 foster children taken in by the Fords at about the same time.
In early 1958, Bean was judicially freed from his natural mother's care, custody and control and was thus available for adoption. Bean remained as a foster child in the Ford household for approximately 18 years overall. During that period, many other foster children were reunited with their natural parents or adopted, but Bean was never interviewed by any prospective adoptive parents nor was his name placed in the Fords' foster children register. He was also kept in the household even after the Fords stopped accepting new foster children. During his 18 years in the Ford household, Bean testified, they changed his religion from Protestant to Catholic, called him "son" in the presence of others, encouraged a brother-sister relationship with their only child, Mary Catherine Ford (Mary Catherine), and included him in family vacations. Similarly, he referred to the Fords as "mom" and "dad" and to Mary Catherine as his sister.
The Fords never applied to adopt Bean. Indeed, Bean admitted that neither Ford discussed the subject of adoption with him during his 18 years with them, nor did they promise to adopt him or provide him with any inheritance. On the other hand, Bean testified that Mary Catherine told him once that her parents had wanted to adopt him, but did not do so due to unspecified problems with the natural mother and paperwork. Similarly, a former neighbor and friend of the Fords testified that the Fords wanted to adopt Bean, but Mrs. Ford was worried that, if they tried to do so, Bean might be temporarily removed from their custody and mistreated.
In 1973, Mrs. Ford died. Bean, although 18 then, stayed at the Ford home for another two years and during that period, he financially contributed to the household from his income as a butcher. In 1975, at age 20, he left the Ford household and a few years later was married. Ford loaned Bean $5,000 to start a new household, and later forgave a $2,000 balance when Bean's marriage failed. Throughout this time, Bean continued to stay in touch with both Ford and Mary Catherine.
In 1989, Ford suffered a fall and disabling stroke. Mary Catherine, who never married, was apparently unable to cope with Ford's post-stroke medical needs, and Bean persuaded her that Ford needed to be placed in an elder care facility. Bean visited Ford in that facility on a regular basis.
Later in 1999, Mary Catherine died of cancer; her life insurance proceeds were designated to go to her father, Ford. Bean, identified in the policy as her brother, was named as alternate beneficiary. The same former neighbor and friend of the Fords testified that Mary Catherine had assumed she would outlive her father and intended to put Bean's "name on the house with mine because I have no other family."
In any event, after Mary Catherine's death Bean obtained a temporary power of attorney from Ford and petitioned the Superior Court for the appointment of a long-time *861 family friend who lived near Ford's care facility, Joan Malpassi, as Ford's conservator. Bean and Malpassi participated in the decision to put Ford on life support systems at his nursing home and, during the same general period, also arranged for Mary Catherine's funeral. Bean was appointed administrator of the latter's estate, which was distributed to the Ford conservatorship.
On May 22, 2000, Ford died intestate. His nearest relatives, respondents herein, were his nephew, John J. Ford III, and his niece, Veronica Newbeck. Neither had any contact with Ford over the last 15 years of his life. Malpassi, the conservator, advised the nephew of his uncle's and cousin's death via counsel. On June 29, 2000, both Malpassi and Ford's nephew filed petitions for letters of administration. The nephew's petition listed only himself as Ford's heir, while Malpassi's listed the nephew, Ford's niece's three sons, and Bean as potential heirs. (The nephew was apparently under the impression that his sister was deceased, and had so advised Malpassi's counsel.) On July 31, 2000, the probate court appointed Malpassi special administrator. On August 7, 2000, the nephew filed a petition to determine heirship (Prob.Code, § 11700[1]), this time listing both himself and his sister as Ford's heirs. On October 4, 2000, Bean filed a "Statement of Interest," claiming to be entitled to distribution of Ford's entire estate based on both foster child heirship (§ 6454) and the doctrine of equitable adoption. (§ 6455.)
A one-day bench trial was held on December 18, 2000, and briefs filed both before and after trial. On March 12, 2001, the court issued its tentative ruling holding, inter alia, that because Bean did not meet the foster child heirship requirements of section 6454, he had not proven equitable adoption. Bean's counsel filed objections contending, inter alia, that the court's tentative decision confused the two concepts and that, in any event, the standard of "clear and convincing evidence" was not applicable to a claim of equitable adoption under section 6455.
On April 10, 2001, the trial court issued a revised ruling and order denying Bean's claim. In it, the court concluded that there was no clear and convincing evidence of an intent by Ford to equitably adopt Bean, and thus denied Bean's claim. A timely notice of appeal was filed. (See § 1303, subd. (g).)

III. DISCUSSION

A. The Trial Court's Ruling and Issues on Appeal

Initially, Bean contended before the trial court that he was entitled to the entire Ford estate under both sections 6454 and 6455. The former provides, inter alia, that a foster child may inherit via intestate succession if (1) the foster parent-child relationship continued throughout the joint lifetimes and (2) there is "clear and convincing evidence" that the foster parent would have adopted the foster child "but for a legal barrier." (§ 6454.) By the time his trial brief was filed, however, Bean had apparently abandoned any argument based on section 6454 and, instead, argued solely the applicability of the equitable adoption doctrine recognized by section 6455. That section provides, simply: "Nothing in this chapter affects or limits application of the judicial doctrine of equitable adoption for the benefit of the child or the child's issue." (§ 6455.)
Nonetheless, the trial court ruled on Bean's claim under both sections. Regarding his claim under section 6454, it first characterized that section as dealing "with the equitable adoption of foster children,"[2] but then ruled that Bean did not *862 fall within that section because there was no evidence, much less "clear and convincing" evidence, of the requisite "legal barrier."
Regarding Bean's equitable adoption claim under section 6455, the trial court first summarized the holdings in the authorities principally relied upon by Bean, and then distinguished them: "By contrast, in the instant case, there is no evidence that decedent ever told Terrold or anyone else that he wanted to adopt him nor publicly told anyone that Terrold was his adopted son. Nor was Terrold given use of the family surname. The fact the Fords retained Terrold in their home for 16 years without making him available for adoption by someone else is not, in and of itself, a public acknowledgement of an intent to adopt. Although it is clear that Terrold had an affectionate relationship with decedent who treated him as he would a son, and that Terrold continued to have contact with him for 25 years after leaving the home, these factors are not sufficient to establish by clear and convincing evidence that decedent intended to and did equitably adopt Terrold."
Bean appeals only from the trial court's ruling regarding equitable adoption under section 6455.[3] As to that section, Bean claims that the trial court erred in requiring (1) clear and convincing evidence of equitable adoption and (2) requiring evidence of "intent" to adopt. Both contentions implicate issues of law and hence our review of them is de novo.

B. The Standard of Proof Issue

Citing the second paragraph of Evidence Code section 115[4] and Weiner v. Fleischman (1991) 54 Cal.3d 476, 483-86, 286 Cal.Rptr. 40, 816 P.2d 892, Bean argues that the preponderance of evidence standard is the preferred standard and that nothing in section 6455 mandates a stricter standard of proof. The trial court applied a "clear and convincing" standard to its rulings on Bean's challenges under both sections 6454 and 6455. It was clearly correct in so doing under the first section, for that standard is expressly mandated by section 6454. The trial court effectively carried this standard over into its section 6455 analysis, stating that it could not "discern a reason to apply a clear and convincing burden of proof on a foster child [under section 6454] and a lesser burden of preponderance of evidence on everyone else. Consequently, the court adopts the greater burden of clear and convincing evidence."
Section 6455 has its roots in the 1985 amendments to the now-superseded section 6408 of the Probate Code. It was originally codified as section 6408, subdivision (d), to "make clear that Section 6408 had no effect on the application of the judicial doctrine of equitable adoption for the benefit of the child or the child's descendants." (Cal. Law Revision Com. com., 53 West's Ann. Prob.Code (1991) § 6408, p. 514.) In 1990, subdivision (d) became subdivision (g) of section 6408 without any change in wording. (Id. at p. 512, 286 Cal.Rptr. 40, 816 P.2d 892.) Finally, in the 1993 revisions of the Probate Code, section 6408, subdivision (g), became the current section 6455, again without substantive change. (Cal. Law Revision Com. com., 53 West's Ann. Prob.Code (2002 Supp.) § 6455, p. 257.) And, in the course of that revamp, it was placed directly *863 after section 6454, which previously had appeared as section 6408, subdivision (e). (Id. at § 6454, p. 256.)
Prior to 1985, and as the statute itself recites, the doctrine of equitable adoption was a creature of the common law. It made its first, and somewhat tentative, appearance in California in our Supreme Court's decision in Estate of Radovich (1957) 48 Cal.2d 116, 308 P.2d 14 (Radovich). In that case, the Court affirmed a trial court decision which had sustained objections to an inheritance tax appraiser's report regarding the tax owed by the sole heir to an intestate estate. When he was 17 years old, the to-be-heir, George, came to live with the decedent who promised the boy's natural parents "that he would consider George his son and would adopt him." (Id. at p. 118, 308 P.2d 14.) Subsequently, the heir lived with the decedent for 19 years, worked in the latter's liquor store, changed his surname to his, and was "publicly acknowledged by [the decedent] as his son and the heir to his estate." (Ibid.) However, formal adoption proceedings were never undertaken by the decedent. Nonetheless, on a petition initiated by George, the probate court ruled that he "`occupies in equity the equitable status of an adopted son and by reason thereof is entitled to distribution of all of the Estate of the decedent.'" (Id. at p. 119, 308 P.2d 14.) However, later, an inheritance tax appraiser sought to impose an inheritance tax on George as if he were a "stranger" rather than an adopted child. The trial court ruled that George was the latter and sustained his objections to the inheritance tax appraiser's report. The State Controller appealed, but the Supreme Court affirmed the trial court. In so doing it relied heavily on the in rem nature of the prior probate court proceedings and their consequent finality, rather than on any analysis of the doctrine of equitable adoption.
That doctrine was, however, more fully fleshed out in a dissent of Justice Schauer joined in by Justice McComb. That dissent agreed with the majority regarding the binding nature of the probate court determination, but then argued that an equitably adopted child was a stranger to the blood and hence taxable as such by the inheritance tax authorities. In the course of so arguing, the dissent cited numerous out-of-state cases enforcing promises of inheritances, purporting to summarize their holdings as follows: "When the child takes property in such a case it is as a purchaser by virtue of the contract [citation] and by way of damages or specific performance [citations]. The child does not become, in a legal sense, the child of the adopting parents except for the purpose of receiving title to their property [citation] and is not entitled to letters of administration [citation]. The child shares in the estate of the deceased foster parent as though his own child but not as such. In order to do justice and equity, as far as possible, to one who, though having filled the place of a natural born child, through inadvertence or fault has not been legally adopted, the court enforces a contract under which the child is entitled to property, declaring that as a consideration on the part of the foster parents a portion of their property will pass on their death to the child." (Radovich, supra, 48 Cal.2d at p. 130, 308 P.2d 14 (dis. opn. of Schauer, J.).)
Thus was the concept of "equitable adoption" introduced in California. It became identified as such four years after Radovich via this court's decision in Estate of Rivolo (1961) 194 Cal.App.2d 773, 15 Cal.Rptr. 268 (Rivolo). There, we affirmed a judgment of the Alameda County Superior Court which, after a jury trial in a proceeding to determine heirship, awarded the entire estate to the decedent's "equitably adopted daughter." (Id. at p. 775, *864 15 Cal.Rptr. 268.) That individual had been taken into the household of the decedent and his wife at age eight and, a few weeks later, told she would be legally adopted by them. A few months later, after a few trips to the Oakland courthouse, she was told she had, indeed, been "legally adopted and would be their sole heir." (Ibid.) She and her presumed adoptive father remained close for years, even after her marriage and move to Southern California and the death of his wife. In fact, however, it turned out she was never legally adopted. In affirming the trial court, we said: "We think the record here establishes the existence of a contract of adoption and respondent's part performance thereof by clear, convincing and unequivocal evidence. It is uncontroverted that the respondent was at all times regarded and treated as the adopted daughter of the Rivolos; that they told her and others on numerous occasions that she was legally adopted and would be their sole heir." (Id. at p. 777, 15 Cal.Rptr. 268.)
The next mention of equitable adoption that our research has located was in another altercation between the inheritance tax authorities and a beneficiary identified in the decedent's will as her "adopted son." (Estate of Reid (1978) 80 Cal.App.3d 185, 191, 145 Cal.Rptr. 451 (Reid).) Once again, the trial court had ruled that the tax authorities were wrong in maintaining that, because of the absence of formal adoption papers, that beneficiary's share should be taxed at a higher rate. And, once again, the appellate court affirmed this holding. In the process, it affirmatively characterized the Radovich decision as one implicating "equitable adoption" and ruled that the beneficiary in the case before it was equitably adopted also. (Reid, supra, 80 Cal.App.3d at p. 191, 145 Cal.Rptr. 451.) It principally identified Radovich and our decision in Rivolo as validating the concept of equitable adoption in California.[5]
But it was a 1980 decision of Division One of this District which made clear that the doctrine had taken roots in this state. In Estate of Wilson (1980) 111 Cal.App.3d 242, 168 Cal.Rptr. 533 (Wilson), that court affirmed a ruling of the Santa Cruz Superior Court expressly granting to a man taken into the decedent's home at age three the right to inherit under the doctrine of equitable adoption. After reviewing the evidence before the trial court and discussing Radovich and Rivolo, the court held: "The record, in our opinion, contains substantial evidence from which the trial court reasonably concluded that, according to the above-noted authority, the Wilsons and Keith had entered into a contract of adoption which was faithfully adhered to by them. It is of no consequence that believing other evidence, and drawing different inferences, the court might have reached a contrary conclusion. [Citation.]" (Wilson, supra, 111 Cal.App.3d at p. 249, 168 Cal.Rptr. 533.)
To bring this chronological account to a conclusion, five years after Wilson was published, the Legislature enacted the predecessor section to the present section 6455.
*865 Both Wilson and our decision in Rivolo touch, albeit briefly, on the issue of the standard of proof. In Wilson, Justice Elkington, writing for a unanimous court, stated: "Some authority holds that the evidence in a case such as this shall be `clear and convincing....' . . . Here, the trial court expressly found that the evidence supportive of its judgment was `clear and convincing.'" (Wilson, supra, 111 Cal.App.3d at p. 248, 168 Cal.Rptr. 533.) And in Rivolo, as already noted, we stated: "We think the record here establishes the existence of a contract of adoption and respondent's part performance thereof by clear, convincing and unequivocal evidence." (Rivolo, supra, 194 Cal. App.2d at p. 777, 15 Cal.Rptr. 268.) In both decisions, the words used by the court constitute at least implicit recognition that the applicable burden of proof in such cases is "clear and convincing."[6]
But we also agree with the logic of the trial court in its partial reliance upon the express articulation of the "clear and convincing" standard in section 6454. Although, originally, that section did not appear immediately prior to what is now section 6455, it does now. And it speaks specifically to the required standard of proof in a case where a foster child is seeking to validate intestate succession on the basis that he or she "would have been adopted." The statute explicitly requires that, for such to happen, the foster child must show by "clear and convincing evidence" that the adoption was frustrated by a "legal barrier." (§ 6454.)
Section 6455 covers a broader class of claimants than just the former or current foster children covered by section 6454; it applies to any claimant. We agree with the trial court that common sense suggests that no lesser standard of proof should apply to the broader type of claim permitted by section 6455 than explicitly applies to the more narrow claim permitted by the immediately preceding section.
However, even if the lesser preponderance of the evidence standard applies to a claim under section 6455, any error by the trial court regarding the standard of proof would not prejudice Bean. An appellant must show "that the error was prejudicial (Code Civ. Proc., § 475) and resulted in a `miscarriage of justice' (Cal. Const., art. VI, § 13). [Citation.] "`[A] `miscarriage of justice' should be declared only when the court, `after an examination of the entire cause, including the evidence,' is of the `opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'"" (Pool v. City of Oakland (1986) 42 Cal.3d 1051, 1069, 232 Cal.Rptr. 528, 728 P.2d 1163.) In the course of making this evaluation, appellate courts regularly "reweigh the evidence in determining the prejudicial effect of a given error." (1 Eisenberg et al., Civil Appeals & Writs (The Rutter Group 2000) ¶ 8:302, p. 8-137.) Having done so here, we find, and for the same reasons articulated by the trial court, that the evidence does not sustain Bean's equitable adoption claim no matter what the applicable standard of proof.

C. Quasi-Contract as a Basis for Equitable Adoption

Bean's second contention is that the trial court erred in holding that there had to be an "intent" by Ford to adopt Bean. He argues that a close examination of the doctrine reveals that it is based on a quasicontractual basis rather than a strict contract basis. He is mistaken.
*866 In the first place, "quasi-contract" is simply another name for the equitable remedy of restitution when an unjust enrichment has occurred. Often called quantum meruit, it applies "[w]here one obtains a benefit which he may not justly retain .... The quasi-contract, or contract `implied in law,' is an obligation created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his former position by return of the thing or its equivalent in money." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 91.) "The socalled `contract implied in law' in reality is not a contract. [Citations.] `Quasi-contracts, unlike true contracts, are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice.' [Citation.]" (Weitzenkorn v. Lesser (1953) 40 Cal.2d 778, 794, 256 P.2d 947.)
The concept of quasi-contract, or implied in law contract, is miles away from the facts of this case. In the case before us, no one obtained a benefit or is being unjustly enriched at the expense of Bean. To the extent respondents are "enriched" by becoming the heirs of Ford's estate, it is because of the California law of intestate succession, not because of any mistreatment of Bean by them. Further, the remedy Bean seeks, being the sole heir of Ford, would not return him to any "former position."
Second, the sparse California decisional law regarding equitable adoption has made clear from the outset that it rests on contractual principles including at least an initial intent on the part of the decedent to benefit the putative adoptee. Thus, Justice Schauer's dissenting opinion in Radovich postulated "a contract by a person to adopt the child of another as his own" (Radovich, supra, 48 Cal.2d at p. 130, 308 P.2d 14 (dis. opn. of Schauer J.)) and this court's opinion in Rivolo specifically posited "a contract of adoption." (Rivolo, supra, 194 Cal.App.2d at p. 777, 15 Cal.Rptr. 268.) Most importantly, in its definitive Wilson decision, Division One of this district made very clear that the entire doctrine rests on a contractual, not restitutionary, basis: "It may properly be emphasized that the foregoing authorities concern only the right of an equitably adopted child to inherit by virtue of contract; they do not otherwise, nor do we, equate the rights of such an equitably adopted child with those of a legally, or statutorily, adopted child." (Wilson, supra, 111 Cal.App.3d at p. 247, 168 Cal. Rptr. 533, italics added.)
Bean tries to equate the language used by dissenting Justice Schauer in Radovich with the doctrine of quasi-contracts. But, as already noted, Radovich and the later cases discussing equitable adoption uniformly talked in terms of express (or implied in fact, see Civ.Code, § 1621) contracts. The fact that some general terminology of equitable jurisprudence has been used in explaining the concept does not detract in the least from the clear import of these authorities.
In enacting what is now section 6455, the Legislature merely said that it did not intend, by its other enactments, to "affect[ ] or limit[ ] application of the judicial doctrine of equitable adoption...." That does not, in our view, constitute an invitation to the judiciary to expand the doctrine.

IV. DISPOSITION
The order appealed from is affirmed.
We concur: KLINE, P.J., and LAMBDEN, J.
NOTES
[1] All further statutory references are to the Probate Code, unless otherwise noted.
[2] Query as to this characterization; neither section 6454 nor a recent Supreme Court case interpreting it (Estate of Joseph (1998) 17 Cal.4th 203, 70 Cal.Rptr.2d 619, 949 P.2d 472) uses the term "equitable adoption."
[3] In a footnote in his opening brief, Bean's counsel makes clear that he is not now pressing a claim under section 6454.
[4] That part of that section provides: "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." (Evid.Code, § 115.)
[5] The Reid court also cited two other cases in support of its ruling, Adoption of Parker (1948) 31 Cal.2d 608, 617, 191 P.2d 420, and Estate of Grace (1948) 88 Cal.App.2d 956, 962-963, 200 P.2d 189. The former only briefly mentions the possible application of the doctrine of estoppel to support an asserted adoption, and the latter notes that California decisional law recognizes the validity of contracts to adopt. Thus, neither decision particularly advances our understanding of the equitable adoption concept, much less the standard of proof implicit in it.
[6] Bean cites no standard of proof cases implicating the equitable adoption concept, contenting himself with citations to Evidence Code section 115 and cases applying it.